**NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC., et al., Defendants-Appellants,**

v.

**NATIONAL CONSTRUCTORS ASSOCIATION, et al., Plaintiffs-Appellees.**

Nos. 80–1808, 80–1809.

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1981.

Decided May 17, 1982.

Rehearings Denied Sept. 8, 1982.

Stanley D. Robinson, New York City (Kaye, Scholer, Fierman, Hays & Handler, New York City, on brief), James P. Garland, Anthony W. Kraus, Nora Winay, Semmes, Bowen & Semmes, Baltimore, Md., Laurence J. Cohen, Richard M. Resnick, Sherman, Dunn, Cohen, Leifer & Counts, Baltimore, Md., Milton Handler, Michael Malina, New York City, Peter H. Gunst, Mary K. Farmer, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., Guy Farmer, Washington, D. C. (Farmer, Wells, McQuinn, Flood & Sibal, Washington, D. C., on brief) and Donald M. Barnes, Washington, D. C. (Earl W. Kintner, Dennis C. Cuneo, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., on brief), for defendants-appellants.

Wilbur D. Preston, Jr., Baltimore, Md. (Robert M. Wright, Gerson B. Mehlman, James R. Chason, Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, Md., on brief), Alan D. Cirker, Washington, D. C. (Anthony J. Obadal, Zimmerman & Obadal, Washington, D. C., Ira Genberg, Stokes, Shapiro, Fussell & Genberg, Atlanta, Ga., on brief), for plaintiffs-appellees.

K. L. Estabrook, Donald F. Nicolai, Lindabury, McCormick & Estabrook, Westfield, N. J., on brief, for amicus curiae Mechanical Contractors Ass'n of America, Inc.

John P. Frank, Lewis & Roca, Phoenix, Ariz., on brief, for amicus curiae NECA, Pipe, and Masonry.

Robert J. Fenlon, Stephen J. Burton, Felhaber, Larson, Fenlon & Vogt, St. Paul, Minn., on brief, for amicus curiae The Sheet Metal and Air Conditioning Contractors Nat. Ass'n, Inc.

J. Albert Woll and Laurence Gold, Washington, D. C., on brief, for amicus curiae The American Federation of Labor and Congress of Industrial Organizations.

Jerry J. Williams, Keith B. Bardellini, Freshman, Mulvaney, Marantz, Comsky, Forst, Kahan & Deutsch, Beverly Hills, Cal., on brief, for amicus curiae Const. Industry Advancement Fund of Southern California, Fund for Const. Industry Advancement, San Diego Const. Industry Advancement Fund, and Associated Gen. Contractors, San Diego County, Inc.

Before WIDENER and HALL, Circuit Judges, and MICHAEL,* District Judge.

WIDENER, Circuit Judge:

The National Electrical Contractors Association, the International Brotherhood of Electrical Workers, and other defendants appeal the award of a permanent injunction to plaintiffs who include the National Constructors Association and numerous construction companies, after a finding that the actions of the defendants amounted to price fixing illegal under § 1 of the Sherman Act, 15 U.S.C. § 1. *National Constructors Association, et al v. National Electrical Contractors Association, Inc., et al*, 498 F.Supp. 510 (D.Md.1980). This appeal is taken under 28 U.S.C. § 1292(a)(1) permitting appeals from the award of injunctive relief. A FRCP 54(b) certificate was entered by the district court relating to the counterclaims. We affirm, and modify the injunctive order only slightly.

* United States District Court for the Western District of Virginia, sitting by designation.

This case involves a private antitrust action for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, and damages under § 4 of that Act, 15 U.S.C. § 15, for a violation of § 1 of the Sherman Act, 15 U.S.C. § 1.[1] The plaintiffs below, appellees here, are the National Constructors Association (NCA), an unincorporated trade association made up of companies who perform electrical construction work and transact business in the electrical construction industry, and other corporations performing electrical contracting work which employ IBEW electrical workers.[2] The defendants below, appellants here, are the National Electrical Contractors Association (NECA), an incorporated trade association, whose members perform electrical construction work; the International Brotherhood of Electrical Workers (IBEW), an unincorporated labor union representing electrical workers throughout the country; Charles H. Pillard, President of IBEW International; Robert L. Higgins, Executive Vice President of NECA; Miller Electric Co. and Colgan Electric Co., corporations engaged in electrical contracting work and members of NECA; and the trustees of the National Electrical Industry Fund.[3]

NECA is the largest trade association in the electrical contracting industry, consisting of at least 133 local trade associations or chapters whose members are both union and non-union electrical contractors. The IBEW is the largest union representing electrical workers, representing the vast majority of all of the organized electrical workers in the nation. At the time of the district court's order the members of NECA performed slightly more than 50% of the electrical contracting work in the nation. Since 1960 NECA members have performed between 50 and 60% of such work. Because

of their respective positions, much of the collective bargaining in the electrical contracting industry is done by IBEW and NECA. Local chapters of NECA are assigned territories throughout the country which coincide with the jurisdiction of one or more of the more than 400 IBEW locals. The local chapters of NECA act as multi-employer bargaining representatives and negotiate local collective bargaining agreements with the local IBEW unions. Individual electrical contractors who are not members of NECA usually enter into a labor agreement with the IBEW in one of several ways: (1) Letter of Assent—A—An "A" Letter of Assent authorizes the local NECA chapter to act as the collective bargaining representative for the employer in negotiations with the local union. As such, the employer is, of course, considered a member of the NECA chapter bargaining unit. (2) Letter of Assent—B—A "B" Letter of Assent binds the employer to the terms of the local IBEW–NECA collective bargaining agreement and all approved amendments, but does not make the employer part of the bargaining unit. (3) International agreements—Designed for employers operating on a national basis, such an agreement binds the employer to the terms of local union contracts in the areas in which the employer performs work. (4) Project agreements—These agreements apply to a single construction site and contain any provisions that may be agreed upon. A local contractor may also negotiate separately with the IBEW although this is not commonly done.

Both NECA and IBEW International reserve the right to approve or veto all collective bargaining agreements entered into by the local organizations.

---

1. § 1 of the Sherman Act provides in part:
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

2. The district court has certified a class of plaintiffs as those electrical contractors who, since July 1, 1977 have not been members of NECA and who perform electrical construction

work using workers obtained or employed under the terms of collective bargaining agreements with locals of the IBEW, which agreements contain or incorporate by reference the terms of Article 6 of the NECA–IBEW national agreement.

The plaintiffs/appellees may be referred to as NCA or as appellees.

3. The defendants/appellants may be referred to as NECA or as the appellants.

NECA and IBEW International also enter into national agreements, whose terms are incorporated into local agreements between NECA and IBEW. It is a provision of the 1976 National Agreement between NECA and IBEW[4] that appellees challenged below as being in violation of the Sherman Act. The first five articles of the 1976 agreement provide for the National Electrical Benefit Fund (a pension fund), shift work, management rights, and apprentice ratios. Article 6, the one challenged below, provides for the establishment of an industry fund. Article 6 states:

The parties agree to the establishment of a legally constituted trust to be called the National Electrical Industry Fund.

All construction agreements in the electrical industry shall contain the following language:

"Each individual employer shall contribute one percent (1%) * of the gross labor payroll to be forwarded monthly to the National Electrical Industry Fund in a form and manner prescribed by the trustees no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. Failure to do so will be considered a breach of this agreement on the part of the individual employer." * (an amount not to exceed 1% nor less than 0.2 of 1% as determined by each local chapter and approved by the trustees)

The National Electrical Contractors Association will be responsible to see that the objects of the fund, as outlined in the trust, are adhered to strictly.

No part of the funds collected under this trust shall be used for purely social activities.

No part of the funds collected under this trust shall be used for any purpose which is held to be in conflict with the interests of the International Brotherhood of Electrical Workers and its local unions.

Both parties will be provided with a copy of the Trust and any further amendments.[5]

On December 8, 1976, President Pillard of IBEW and Vice President Higgins of NECA signed the agreement containing the provision for the industry fund. Contemporaneously they signed a paper called "Basic Understandings and Interpretations of the IBEW–NECA Agreement" which provided in part:

Article Six—Industry Fund

(1) It is understood that because of the cost of administration of labor agreements, industry advancement and services rendered to the electrical contracting industry by the National Association and the NECA chapters that the intent of this Article is to insert the industry fund contribution language in all IBEW construction agreements containing the NEBF language except those covering employees of utility companies and municipalities and employees working under contractor equipment maintenance agreements and employees working for motor shops. In return, NECA will provide basic service to electrical contracting employers employing workmen obtained from the IBEW without regard to the affiliation of the individual employer with NECA.

Appellees challenged the industry fund provision under the Sherman Act, alleging that the fund added a 1% charge to the cost of all their electrical construction contracts with IBEW whether the contractor belonged to NECA or not. Appellees noted that prior to the 1976 agreement members of NECA paid dues and a service charge for their membership in and services received

4. This agreement was announced in the spring of 1976 and ratified at the October 1976 meeting of the NECA Board of Governors. The agreement went into effect on July 1, 1977.

5. The National Agreement provides that less than 1% of the labor payroll may be collected by the local NECA chapter, but the local must collect at least .2 of 1%, the amount which must be remitted to the national organization. Both parties, as well as the district court, have treated the required contribution to be 1%. The record supports a conclusion that 1% is the usual amount collected.

from NECA.[6] The 1976 agreement thus increased their cost of doing business. Thus, non-NECA members, who paid no dues or service charges, had a competitive advantage over NECA members when bidding on contracts. In order to end this situation, argued appellees, appellants initiated the 1% contribution to be applied uniformly to all IBEW construction contracts whether the contractor was a member of NECA or not, thereby stabilizing the price of electrical construction contracts. As a result, non-NECA contractors no longer had a competitive edge over their NECA competitors. Appellees claimed that appellants' actions constituted price fixing, a per se violation of the Sherman Act. The district court agreed and in a thorough and detailed opinion granted summary judgment for the appellees, finding the anticompetitive purpose necessary for a finding of price fixing a per se violation of the Sherman Act.[7]

The district court also summarily dismissed as without merit the NECA defendants' counterclaims that appellees were engaged in a boycott, illegal under § 1 of the Sherman Act, by their concerted refusal to pay what they owed into the industry fund. 498 F.Supp. at 551. The NECA defendants appeal this grant of summary judgment for the appellees on the counterclaims.

Before dealing with appellants' substantive arguments, we note that appellants Colgan Electric and Miller Electric argue as a separate issue that the district court erred in not granting their motion to dismiss the complaint because venue was improper as to them since they were not transacting business in Maryland as required by § 12 of the Clayton Act, 15 U.S.C. § 22.[8] The district court found that they were in fact transacting business in Maryland because of their dealings with NECA to which they both belonged and paid substantial amounts in the form of dues and industry fund contributions. We cannot say that such a conclusion is clearly erroneous, and accordingly affirm the district court's denial of the motion to dismiss. *United States v. Scophony Corp.*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1947). See especially *Scophony* at p. 807, 68 S.Ct. at p. 861, and the concurring opinion of Justice Frankfurter at p. 818, 68 S.Ct. at p. 867.

Appellants' primary contention on appeal is that summary judgment for the appellees in their price fixing case was inappropriate. Preliminarily we note that the Supreme Court has cautioned against the granting of summary judgment in antitrust cases, stating in *Poller v. Columbia Broadcasting Systems*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles...," and we have had occasion to follow this case in *Morrison v. Nissan Co., Ltd.*, 601 F.2d 139 (4th Cir. 1979). This is not to say that summary judgment is never appropriate in antitrust cases, see *White Motors Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), and in fact grants of summary judgment in such cases have been explicitly affirmed. *Citizens Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); *First National Bank v. Cities Service*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

With these rules in mind, we analyze appellants' arguments. They initially contend that summary judgment was inappropriate because a genuine issue of fact exists

---

6. The dues were $50.00 per year with a service charge of .2% of their labor payroll after the first year of membership.

7. The district court discussed at length the evidence before it which had been produced by both sides regarding the agreement. We need not discuss such evidence in any detail except as it applies to the issues to be dealt with later in this opinion.

8. § 12 of the Clayton Act reads in part:

Any suit, action, or proceeding under the anti-trust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business....

The parties agree that Miller and Colgan are neither inhabitants of Maryland nor are they found there.

regarding the meaning of Article 6 of the NECA–IBEW National Agreement. First, they argue that the language of Article 6, when considered in connection with the remainder of the National Agreement, is ambiguous on its face. The district court disagreed, holding instead that the language in the agreement clearly required the inclusion of the fund in all IBEW electrical construction contracts at issue here. We agree that there is nothing ambiguous at all about the agreement's language. On its face the agreement requires inclusion of the industry fund clause in all such contracts.

Even if the language itself is clear, argue the appellants, a consideration of the evidence submitted in the form of documents and pre-trial depositions create an issue of fact as to the meaning of Article 6. To support this argument, appellants principally rely upon several pieces of evidence which we shall consider separately. We find no error in the district court's rejection of the pre-trial depositions submitted by the appellants as sufficient to create an issue of fact. This testimony amounted to no more than a denial of the meaning of the clear words of the contract. In no way does it seek to clarify the terms of the contract, but instead seeks to change the terms of an already clear agreement.[9]

Appellants also contend that other documents submitted to the district court create a question of fact as to the meaning of Article 6. The minutes of the October 1976 Board of Governors meeting of NECA reflect that Robert Higgins, Executive Vice President of NECA, read to the group a letter from its counsel, Henry H. Glassie, with reference to whether or not the NECA bylaws would have to be amended to reflect the industry fund as a change in NECA dues. Concluding that they would not, Glassie in part stated, as transcribed, as follows: "If the industry fund provided for in the Article 6 of the agreement referred to in proposal number 3 applies to the

NECA members, as such, a change in the by-laws would be involved. However, we are informed that the contribution to this fund as provided in Article 6 will be required of all union electrical contractors whether they are members of NECA or not. Indeed, would be applicable to a company after resignation from NECA. And moreover that the contribution will not be required of non-NECA members and non-union members of NECA."

We first note that the minutes of the meeting are self contradictory. At one place they state that the industry fund contributions are "required of all union electrical contractors whether they are members of NECA or not." In the second sentence following, the minutes then contradict themselves as they state that "the contribution will not be required of non-NECA members and non-union members of NECA." The very best that can be said of the minutes is that they both corroborate and flatly contradict NECA's position in the case. There was a mistake made in reading the letter from Glassie, however, or in the transcription of the minutes of the meeting. The letter itself did not contain the critical words "non-NECA members and," but read (in the form of a clause in the letter) "The contribution will not be required of non-union members of NECA." Even if we accept the minutes of the meeting instead of the content of the letter (and no reason is offered as to why the letter is not the proper document to use), they do not clarify any claimed ambiguity existing in the agreement but amount at the best to no more than an ambiguous interpretation thereof. The letter from Glassie obviously supports the already clear contract terms, and, indeed, its observation that contribution would not be required of non-union members of NECA only states the obvious. In all events, the status of non-union members of NECA is not a matter of dispute in this case and is of no consequence.

---

9. This also applies to IBEW President Pillard's letter to NCA in June 1977 in which Pillard denied the interpretation of the agreement that NCA placed upon it, but immediately followed the denial with the statement that: "It is true that, by July 1, 1977, we expect that all local IBEW–NECA agreements will have been amended to include a number of new provisions, including contributions to the [Industry] Fund."

Appellants next rely upon a December 1976 letter from Charles Pillard, President of IBEW International, to its locals which notes that local unions are to seek to reopen agreements with non-NECA employers by mutual consent to include the industry fund in "all non-NECA inside and outside construction agreements." We see no way that this letter supports appellants' position, rather, it supports appellees' contention that the provision for the industry fund goes in all applicable contracts. We reject appellants' argument that this evidence shows that they merely intended to request the inclusion of the fund in labor contracts, for the letter obviously applied to existing contracts which would require agreement to change.

Appellants next rely upon three letters from Pillard to three different local unions, their text being very similar, advising the locals that they must bargain in good faith with contractors who terminated their letters of assent. Again, we do not see how these letters support appellants' contentions. At best they show that the local unions were advised as to their obligations under the National Labor Relations Act to bargain in good faith as to a whole contract and not take a take or leave it stance in negotiations.

Finally, appellants rely upon a June 1978 letter from Pillard to the union locals which stated that local unions should specifically remove from the bargaining table the industry fund if a contractor objected to its inclusion. Not only was this letter sent almost a year after this lawsuit was filed, it only reflects how the union at that later time wished to handle the industry fund. It does not clarify the agreement itself.

All of this evidence taken together shows no more than appellants' attempt to change the meaning of the National Agreement to reflect how they *now* wish the contract to be read. None seeks to clarify any particular language or term in the National Agreement. As such, they have no effect upon an obviously clear agreement.

The National Agreement and the Basic Understanding must be considered together as documents which are a part of the same transaction. *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261 (5th Cir. 1966); 4 Williston, *Contracts* (3d Ed.) § 628. The agreement states very clearly that the industry fund goes "in all construction agreements in the electrical industry." As such, we need go no further to find appellants' intent. *Locafrance U. S. Corp. v. Intermodal Systems Leasing*, 558 F.2d 1113 (2d Cir. 1977); *E. P. Hinkel Co. v. Manhattan Co.*, 506 F.2d 201 (D.C.Cir.1974). But, even if we go further, the Basic Understanding says the same thing, to wit: "in all IBEW construction agreements containing the NEBF language." The evidence shows, without dispute, in the NECA–IBEW Employees Benefit Agreement, that all contracts with IBEW unions contain NEBF provisions whether the contractor belongs to NECA or not. These two documents, then (the National Agreement and the Basic Understanding), read separately or together leave no doubt as to the applicability of the industry fund to all IBEW construction contracts. Appellants' evidence shows no more than that NECA and the IBEW sought to read the contract differently at a later date.

We also agree with the district court that the evidence presented was so removed in time and self serving as to not create a genuine issue of fact as to the meaning of the contract. The district court did not err in relying upon the clear language of the agreement in deciding the issue in the appellees favor.[10] *Va. Impression Products*

---

10. Appellants further claim that in actuality IBEW did not insist upon inclusion of the fund in every contract signed, and that some labor contracts entered into during this time did not include the industry fund. The fact that the IBEW was somewhat less diligent than it might have been in enforcing the provisions of the National Agreement is not a defense, especially since the language of the agreement itself leaves no room for debate that the fund was to be included in all construction contracts. An activity does not have to be a complete success to violate the antitrust laws. *United States v. Trenton Potteries Co.*, 273 U.S. 392, 402, 47 S.Ct. 377, 381, 71 L.Ed. 700 (1927); *United States v. Bensinger Co.*, 430 F.2d 584 (8th Cir.

*Co. v. SCM Corp.*, 448 F.2d 262 (4th Cir. 1971).

Appellants next claim that the district court erred in concluding that the agreement in question constituted price fixing illegal per se under the Sherman Act. Instead, they contend that no restraint of trade existed. Alternately, if a restraint of trade is found, appellants contend that it must be judged under the rule of reason.

■ Although a literal reading of the Sherman Act would make illegal all contracts if they restrain trade in any particular, the Supreme Court has construed the statute to outlaw only unreasonable or undue restraints. *Standard Oil of N. J. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). In *Standard Oil* the Court established the rule of reason as a method of examining the actions of parties to determine if § 1 has been violated by looking at the purpose, character, and effect of the actions in question. Unreasonableness is based upon either the nature of the contract or upon the surrounding circumstances that give rise to an inference that the parties intended to restrain trade or enhance prices. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). By this standard, the courts decide whether conduct is unreasonably anticompetitive in character or in effect.

■ Certain practices whose nature and effect are so clearly anticompetitive have been held to be illegal per se. Those specifically include price fixing.[11] E.g. *United*

*States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Pa. W. & P. Co. v. Consolidated G. E. L. & P. Co.*, 184 F.2d 552 (4th Cir. 1950). The critical analysis in determining whether a particular activity constitutes a per se violation is whether the activity on its face seems to be such that it would always or almost always restrict competition and decrease output instead of being designed to increase economic efficiency and make the market more rather than less competitive. *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

■ As just noted, price fixing is one of those practices that the Court has held to be illegal per se under the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The Court stated at 223, 60 S.Ct. at 844 "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." To be guilty of price fixing, the conspirators do not have to adopt a rigid price, substantially less has been found to be price fixing.[12] An activity can violate the per se rule even if its effect upon prices is indirect. *United States v. General Motors*, 384 U.S. 127, 147, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966). In essence, an interference with the market forces freely setting the prices of goods is sufficient. *In Re Yarn Processing Patent Validity Litigation*, 541 F.2d 1127, 1137 (5th Cir.) cert. den. 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977).

1970); *Plymouth Dealers Assoc. v. United States*, 279 F.2d 128 (9th Cir. 1960).

**11.** As the Supreme Court noted in *Northern Pacific RW v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958): "because of their pernicious effect on competition and lack of any redeeming virtue [such activities] are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." The Court mentioned price fixing, division of markets, group boycotts, and tying arrangements.

**12.** *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), elimination of interest free short term credit;

*United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), exchange of price information as stabilizing although lowering prices; *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), setting minimum prices; *Kiefer-Stewart Co. v. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), setting maximum prices; *United States v. Socony-Vacuum Oil*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), buying surplus gasoline to stabilize prices; *Plymouth Dealers Assoc. of Northern Cal. v. United States*, 279 F.2d 128 (9th Cir. 1960), establishing price list from which negotiations began.

■ There can be no doubt that the agreement in question here, which adds a 1% charge to all IBEW construction contracts falls within the definition of price fixing. By taking the additional 1% of labor costs from non-NECA contractors it robs them of a competitive advantage beneficial to the public. It clearly interferes with the market forces that set the price of such contracts. The industry fund would tend to stabilize the price of electrical construction contracts, a practice illegal per se under the Sherman Act.

■ Appellants further contend that even if the per se doctrine is applicable the district court erred because a genuine issue of fact existed as to the purpose of the fund. Additionally, they argue that the district court erred as a matter of law because it concluded that an anticompetitive effect need not be shown in order to prove price fixing. Appellants would argue instead that both anticompetitive purpose and effect must be proven. Such an argument is without merit. We know of no better statement of the rule than that of this court in *United States v. Society of Ind. Gasoline Marketers*, 624 F.2d 461, 465 (4th Cir. 1979), cert. den. 101 S.Ct. 859, 449 U.S. 1078, 66 L.Ed.2d 801, where we stated: "Since in a price-fixing conspiracy the conduct is illegal per se, further inquiry on the issues of intent or the anti-competitive effect is not required. The mere existence of a price-fixing agreement establishes the defendants' illegal purpose since '[t]he aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition.' *United States v. Trenton Potteries*, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700 ...." See also 2 Areeda & Turner, *Antitrust Law* § 314.[13] As this decision makes clear, a specific finding of anticompetitive purpose and effect is not

needed. But, even if it were, there is no doubt, as the district court found, that, on its face, this agreement has an anticompetitive purpose, which is to add the 1% of labor cost to all IBEW construction contracts which could only stabilize prices of NECA and non-NECA contractors.

This brings us to appellants' objections to the injunctive order entered by the district court which was in two parts.

The first part of the injunction enjoins NECA and IBEW and others named from "seeking to continue, continuing, enforcing, maintaining, or renewing Article 6 of the National Agreement ... as to any person, corporation, or other entity which is not a member of the National Electrical Contractors Association or from entering into, maintaining or participating in any act, contract, agreement, understanding, plan, program, or other arrangement with any person, corporation, or other entity which is not a member of the National Electrical Contractors Association that includes any provision for implementation of Article 6 of the aforesaid agreement." The second part of the injunction enjoins the same defendants from "demanding, soliciting, collecting or receiving from any person, corporation or entity which is not a member of the National Electrical Contractors Association contributions to the National Electrical Industry Fund, or any alternate or substitute therefor, the effect of which would be to add a surcharge, determined by a uniform formula, to the cost of procuring all contracts with the IBEW in the electrical construction industry."

■ Appellants object to the first part of the injunction as being overbroad in that a non-NECA employer who voluntarily assents to pay into the industry fund should

---

**13.** In *United States v. McKesson & Robbins*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956), the Court stated: "It has been held too often to require elaboration now that price fixing is contrary to the policy of competition underlying the Sherman Act & that its illegality does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. It makes no difference whether the motives of the participants are good or evil, whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices."

not have been included. That objection is without merit. In *Perma Mufflers v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Court held that the fact the plaintiff may have been *in pari delicto* does not prevent a suit under § 1 of the Sherman Act. The Court said the courts do not "have power to undermine the antitrust acts by denying recovery to injured parties merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others." p. 139, 88 S.Ct. p. 1984. Thus, under *Perma Mufflers* there is no reason to deny non-NECA employers relief although they may have previously voluntarily assented to a NECA-IBEW agreement.

■ Appellants next object to the second part of the injunction which they say could be construed to prohibit any demand that an IBEW local might unilaterally make in collective bargaining to be characterized as a uniform surcharge on labor contracts. They say that it prevents the union, even acting unilaterally, from doing the very thing that § 7 of the National Labor Relations Board Act, 29 U.S.C. § 157, permits unions to do, that is, to bargain collectively on any permissive or mandatory subject of bargaining. That objection is well taken only to a very small extent. The question of whether or not the industry fund is either a permissive or mandatory subject of collective bargaining is not before us, but, for present purposes, we will assume that it is a permissive subject of collective bargaining. Merely, however, because establishment and maintenance of the industry fund may be a permissive subject of collective bargaining does not automatically exempt the IBEW from the provisions of the antitrust laws. This was specifically held in *Allen Bradley v. Local Union No. 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). In *Allen Bradley* the Court upheld a finding of the district court which had found Local 3 of IBEW guilty of a violation of the Sherman Act for acting in concert with business organizations and with manufacturers of goods to restrain competition in and monopolize the marketing of such goods in New York City. The Court found

that "... the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups." 325 U.S. at 810, 65 S.Ct. at 1540. The gist of the Court's reasoning, which is applicable here, is found on the same page of the opinion where it said: "For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves." The Supreme Court in *Allen Bradley* did require a modification of the decree "so as to enjoin only those prohibited activities in which the union engaged in combination 'with any person, firm or corporation which is a non labor group'". p. 812, 65 S.Ct. p. 1541. The second part of the order complained of does no more than this. It enjoins the "above mentioned defendants" (which include NECA and IBEW) from demanding, etc., from non-NECA members contributions to the National Electrical Industry Fund. The order must be read in the context of the case instead of divorced from it. As such, it undoubtedly means the defendants acting together and not the defendants acting severally. It leaves IBEW entirely free to pursue any legitimate object of collective bargaining acting unilaterally, but, this, of course, does not include IBEW acting "with any person, firm or corporation which is a non-labor group," *Allen Bradley*, p. 812, 65 S.Ct. p. 1541, to violate the Sherman Act, and this expressly includes the maintenance of the industry fund as expressed in the contract between NECA and IBEW.

■ The standard by which we review such injunctive orders is "whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 698, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978). We think the order of the district court meets that standard; it does no more than enjoin the enforcement of, and collection of money under, a contract held to violate the antitrust laws.

Despite what we have just said with respect to the second part of the order complained of, out of perhaps an over abundance of caution, and in order to prevent any reading out of context of that part of the district court's order, we direct that the district court modify the second part of its order so that it applies to IBEW only when IBEW is engaged in the prohibited activities "in combination with any person, firm or corporation which is a non-labor group." *Allen Bradley* at 812, 65 S.Ct. at 1541.

We have discussed in some detail the principal contentions of appellants and note that we have considered all of their other assignments of error and find them without merit, including those relating to the granting of summary judgment in favor of appellees on the NECA defendants' counterclaims. Except as may be otherwise indicated in this opinion, we rely upon the district court's complete and thorough discussion of the issues in this case, and its judgment is accordingly

AFFIRMED AS MODIFIED.[14]

K. K. HALL, Circuit Judge, dissenting:

Through its blind application of the *per se* rule against price fixing, the majority ignores the realities of this case and, as a consequence, reaches a manifestly inequitable result. As I believe that the facts before us do not justify an extension of the *per se* price fixing rule, I must respectfully dissent.

Under a provision in the collective bargaining agreement between the National Electrical Contractors Association (NECA) and the International Brotherhood of Electrical Workers (IBEW), the IBEW could not sign any employment contract unless the employer agreed to pay one percent of its gross monthly labor payroll into the National Electrical Industry Fund. Finding that this requirement acts to increase the labor costs to non-NECA contractors and "would tend to stabilize the price of electrical construction contracts," the majority concludes that the agreement is *per se* illegal under the Sherman Act, 15 U.S.C. § 1.

This case, however, is inherently different from those relied on by the majority in that all of the parties involved here receive an extremely important benefit from the NECA/IBEW negotiations, that being the establishment of a fixed wage level. "Assenting" non-NECA contractors (i.e., those who agree to follow the terms of the NECA/IBEW agreement through either "A" or "B" Letters of Assent or International Agreements) receive the benefit directly by accepting all of the gains and concessions secured by NECA during the course of the negotiations.

Non-assenting contractors who bargain directly with the Union enjoy the benefit in a similar, albeit indirect, manner. They have the terms of the NECA/IBEW agreement, especially the wage level, on which they can rely during the course of their independent negotiations. The salary level agreed to by NECA may be employed as a ceiling on the Union's demands. Indeed, the Union has an incentive to obtain a high wage rate from NECA which it will then attempt to carry over into its non-NECA contracts. *See generally* P. Samuelson, ECONOMICS 586–87 (10th ed. 1976). Thus, any wage concessions NECA is able to draw out of IBEW spill over to the benefit of all non-assenting non-NECA contractors.

---

**14.** We are aware that, on its particular facts, this is a case of first impression and as such we should be careful in applying the per se rule. *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979). Cases are legion, however, declaring the illegality of price fixing in various forms, and the agreement here, we think, is as clear as the one struck down in *Citizens Publishing Co. v. U. S.*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). The conclusion reached by the Court in that case that "[t]he joint operating agreement exposed the restraints so clearly and unambiguously as to justify the rather rare use of a summary judgment in the antitrust field," p. 136, 89 S.Ct. p. 929, is applicable here. The Supreme Court, indeed, in *United States v. Container Corp.*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), a price fixing case "unlike any other" decided by that Court, found a per se antitrust violation in reviewing a dismissed *complaint*, certainly without the benefit of any more documents than we have available here.

Since all electrical contractors benefit from NECA's collective bargaining, it is only fair that they share in the costs of such bargaining. In this regard, it is clear that one of the main purposes of the industry fund is to help defray the costs of the negotiation process. Under the majority's ruling, however, although both assenting and non-assenting non-NECA contractors would continue to enjoy the benefits of NECA's bargaining, neither can be required to contribute to the fund. Moreover, they will receive a windfall in the form of treble damages.

In *Smitty Baker Coal Co. v. United Mine Workers of America*, 620 F.2d 416 (4th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980), we ruled that a protective wage clause, requiring a union to demand the same wage scale from all employers who were not members of the multi-employer bargaining unit, did not constitute a *per se* violation of the Sherman Act. Rather,

> [t]o amount to an antitrust violation *the agreement must be rooted in an anti-competitive purpose*, and must effect an anti-competitive result, as evidenced by action "ruining" a competitor's business or driving him "out of business." Unless there is such an agreement between the labor organization and the non-labor group and such an anti-competitive result, there is no conspiracy actionable under the antitrust laws.

*Id.* at 431–32 (emphasis supplied).

Since the one percent industry fund charge at issue here has no greater effect on electrical contractor prices than would a protective wage clause, I would follow the *Smitty Baker* standard and avoid the majority's untenable extension of the *per se* rule.

As a final matter, I also disagree with the majority's conclusion that the trial judge did not err in finding defendants Colgan Electric Co. (Colgan) and Miller Electric Co. (Miller) within the venue of the court. The record indicates that their most significant contact with the judicial district of Maryland was the payment of dues to NECA which has its national office located in that state. The holding that mere membership and payment of trade association dues is enough to constitute "transact[ing] business" under § 12 of the Clayton Act, 15 U.S.C. § 22, flies in the face of the well established rule that a defendant's contacts with the forum state must be of a *"substantial character"* in order for venue to be proper. *See Bartholomew v. Virginia Chiropractors Association*, 612 F.2d 812, 815 (4th Cir. 1979), *cert. denied*, 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980). Consequently, the district court clearly erred in failing to dismiss the complaint against defendants Colgan and Miller.

For the foregoing reasons, I respectfully dissent.